IN THE SUPERIOR COURT OF FULTON COUNTY

STATE OF GEORGIA

| | |
|---|---|
| ELLERY STEED | ) |
| Plaintiff, | ) |
| | ) Case No.2008CV145708 |
| vs | ) |
| | ) |
| | ) |
| MERSCORP, INC., MORTGAGE | ) |
| ELECTRONIC REGISTRATION SYSTEMS | ) AMENDED COMPLAINT |
| INC., CITIGROUP INC., COUNTRYWIDE | ) |
| FINANCIAL CORPORATION, FANNIE MAE, | ) |
| FREDDIE MAC, GMAC-RFC HOLDING | ) JURY TRIAL DEMANDED |
| COMPANY,LLC d/b/a/ GMAC RESIDENTIAL | ) |
| FUNDING CORPORATION, HSBC FINANCE | ) |
| CORPORATION, JP MORGAN CHASE & CO, | ) |
| WASHINGTON MUTUAL BANK, WELLS FARGO | ) |
| & COMPANY and EVERHOME MORTGAGE CO. | ) |
| | ) |
| Defendants, | ) |

## INTRODUCTION

Plaintiff brings this action against Merscorp, Inc., and its wholly owned subsidiary, Mortgage Electronic Registration Systems, Inc. ( collectively "MERS" ). This action is also brought against the controlling shareholders of MERS, Citigroup Inc., Countrywide Financial Corporation, Fannie Mae, Freddie Mac, GMAC-RFC Holding Company, LLC, d/b/a GMAC Residential Funding Corporation, HSBC Finance

1

EXHIBIT
3
" "

Corporation, JPMorgan Chase & Co., Washington Mutual Bank, and Wells Fargo & Company ( "Shareholders" ) for the reason that, during all relevant times, MERS was under the complete dominion and control of the Shareholders and acted as the alter ego of the Shareholders with regard to the conduct alleged herein. This action is also brought against EverHome Mortgage Company, a loan servicer and/or agent and/or member of MERS. At all relevant times EverHome was the loan servicer handling plaintiff's loan. Plaintiff's allegations are based upon his own personal knowledge and upon information and belief as to other matters. Plaintiff sets forth the following allegations in law and equity to the extent applicable, and as a defense to the foreclosure proceeding commenced by defendants.

## NATURE OF THE CASE

1.    This action is for breach of contract, unjust enrichment, breach of covenant of good faith and fair dealing, unfair trade practices, negligent commencement of foreclosure proceedings, fraud, violation of the Constitution of the State of Georgia  as to the right to free and unfettered access to the courts to address grievances; and for violation of the Georgia Fair Housing Act.  Each claim is based upon defendants' (1) fraudulent charging and overcharging of late fees, (2) inflated

escrow charges, (3) inexplicable disappearance of mortgage payment(s) dispersed to EverHome by bankruptcy trustee (4) grossly excessive, unsubstantiated and fraudulent charges of attorneys fees and foreclosure fees and various other unsubstantiated, unreasonable and inflated charges denoted as " corporate advances ". For example, the defendants attempt to collect "foreclosure fees" exclusive of other fees and arrearages, as alleged hereafter, in an amount approaching $ 30,000 on a home bought at the purchase price of $154,000 in July of 2004. Defendants continue to extract such fees which have collectively forced plaintiff into foreclosure and the potential loss of approximately $35,000 to $40,000 in equity he had accumulated in the home. In fact, the present foreclosure action represents the third attempt to foreclose by defendants.

2.    MERS standard Fannie Mae/Freddie Mac form mortgage note ("note") substantially similar to the one executed by plaintiff, specifically authorizes the note holder to be reimbursed for all _its_ costs and expenses in enforcing the note  including reasonable attorneys' fees. Because MERS enters into fixed amount, per-case, fee arrangements ("flat-fee agreements") with attorneys acting on its behalf, it is necessarily limited, under the terms

3

of the note, to only reimbursement of those predetermined flat fees. In addition, MERS cannot extract other costs, fees and expenses from borrowers without an actual, verifiable or reasonable and legal basis for such fees. A demand for payment of fees and expenses that exceed actually incurred or obligated amounts or which are prohibited by law, represents a clear breach of contract under the note and the laws of the State of Georgia.

3.      Plaintiff seeks to recover compensatory damages, punitive damages and/or vindictive damages including damages for his embarrassment and humiliation and pain and suffering occasioned by defendants abusive and fraudulent conduct and for recovery of all fees wrongfully charged from the date of execution of the note to the present on a "continuing violation" theory. Plaintiff also seeks injunctive relief ordering defendants to cease their offending practices and a revision of the note making its terms comply with the Constitution of the State of Georgia by the elimination of grossly one-sided, unreasonable and unconscionable terms to the extent relied upon by defendants, so as to make the subject terms valid and enforceable.

## JURISDICTION

4

4.     Plaintiff is an African-American and resident of Fulton County and the Defendants are either incorporated in the State of Georgia and/or systematically and continually conduct business throughout the State.

<u>DEFENDANTS</u>

5.     MERS

(a)     Defendant Merscorp, Inc. is a Georgia corporation with its principle place of business located at 1595 Spring Hill Rd, Suite 310, Vienna, Virginia 22182. According to Dunn & Bradstreet, Inc., Merscorp, Inc. has approximately 40 employees and reports yearly income of less than $ 9.5 million.  Merscorp has a registered agent CT Corporation System at 1201 Peachtree St., Atlanta GA.

(b)     Defendant Mortgage Electronic Registration System, Inc., d/b/a MERS, is a wholly-owned subsidiary of defendant Merscorp, Inc., and is a Delaware corporation. Merscorp and MERS share the same address at 1595 Spring Hill Rd, Suite 310, Vienna, Virginia 22182. According to Dunn & Bradstreet, Inc., MERS, Inc., has approximately 20 employees (overlapping those of Merscorp, Inc.) and reports yearly income of approximately $1.7 million.

(c)     The members of MERS include the defendant shareholders of Merscorp, Inc., Citigroup Inc.,

Countrywide Financial Corporation, Fannie Mae, Freddie Mac, GMAC-RFC Holding Company, LLC, d/b/a GMAC Residential Funding Corporation, HSBC Finance Corporation, JP Morgan Chase & Co, Washington Mutual Bank, and Wells Fargo & Company, and numerous other mortgage lenders, servicers, title insurers and mortgage insurers, who make application and pay a membership fee. MERS members may use the registration system established and maintained by MERS.

(d) MERS was created in 1996 by the mortgage banking industry to create a secondary mortgage market, internally administer the buying and selling of mortgages, and to simplify the administration of home mortgages, including foreclosure proceedings. When a mortgage loan is registered on the MERS system, title is held in the name of MERS and MERS acts as a mortgagee of record in county land records. While mortgages may get assigned many times over the life of the loan, MERS remains holder of record. And, although there may be no recordation of such assignment on county land records, MERS controls records on transfers of financial and title interest of its mortgages.

(e) In its directives to its members and agents regarding foreclosures, MERS states:

Foreclosing a loan in the name of Mortgage Electronic

Registration Systems, Inc. is something new in the foreclosure arena. However, <u>when the role of MERS is examined, it becomes clear that MERS stands in the same position to foreclose as the servicer. MERS, like the servicer, will be the record mortgage holder It is the mortgage that gives MERS the authority to foreclose.</u> (emphasis added )

(f)    The beneficiaries of MERS include mortgage originators, mortgage servicers and sub-servicers, warehouse lenders, wholesale lenders, retail lenders, document custodians, settlement agents, title companies, insurers and investors. In the various steps of administration of a mortgage, these beneficiaries act as agents of MERS, and with authority granted by MERS, whether they are acting on their own behalf or on behalf of MERS.

6.    <u>CONTROL SHAREHOLDERS</u>

(a)    Defendant Citigroup Inc., is a New York Corporation that maintains its principal place of business in New York, New York. Citigroup is a principal shareholder of MERS.

(b)    Defendant Countrywide Financial Corporation is a Georgia Corporation that maintains its principal place of business in Calabasas, California. Countrywide is a principal shareholder of MERS.

(c)    Defendant Fannie Mae is a federally chartered corporation that maintains its principal place

of business in Washington, DC 20016. Fannie Mae is a principal shareholder of MERS and has a chartered seat on the MERS board of directors. Fannie Mae has an agent, Corporation Service Company, at 40 Technology Parkway South # 300 Norcross, GA 30092.

(d)    Defendant Freddie Mac is a federally chartered corporation that maintains its principal place of business in Mclean, Virginia. Freddie Mac is a principal shareholder of MERS and has a Chartered seat on the MERS board of directors.

(e)    Defendant GMAC-RFC Holding Company, LLC d/b/a GMAC Residential Funding Corporation, ( "GMAC") is a Michigan Corporation that maintains its principal place of business in Detroit Michigan. GMAC is a principal shareholder of MERS.

(f)    Defendant HSBC Finance Corporation ("HSBC") is a New York Corporation that maintains its principal place of business in Buffalo, New York. HSBC is a principal shareholder of MERS.

(g)    Defendant JP Morgan Chase is a Georgia Corporation that maintains its principal place of business in New York, New York. Chase is a principal shareholder of MERS.

(h)   Defendant Washington Mutual Bank ("WAMU") is a Washington Corporation that maintains its principal place of business in Seattle Washington. WAMU is a principal shareholder of MERS.

(i)   Defendant Wells Fargo & Company is a California Corporation that maintains its principal place of business in San Francisco, California. Wells Fargo is a principal shareholder of MERS.

(j)   At all relevant times, MERS was under the complete control of the foregoing shareholders who own, operate, control, manage, and direct the activities of MERS. MERS was created and established by the "shareholders" for the purpose of facilitating their own business interests and limiting their liability in that effort.

(k)   With only about $11 million in annual income and about 40 employees, MERS is clearly not in any financial position it would need to be in, in order to stand as mortgagee on the tens of millions of mortgage notes it does. However, the "shareholders" annual profits run to the hundreds of billions of dollars for the mortgages where MERS is the primary mortgagee.

(l)   There is no question that the "shareholders" profits are far greater and come with far

9

less exposure to liability through the existence of MERS. It can only be concluded therefore that MERS is grossly undercapitalized to cover the potential liability stemming directly from its role as primary mortgagee on tens of millions of mortgage notes.

(m)    Plaintiff therefore alleges that sufficient basis exists to pierce the corporate veil of MERS and hold these shareholders jointly and severally liable to plaintiff.

(n)    Defendant EverHome Mortgage Company is a Florida Corporation and maintains its principle office in Jacksonville, Florida. EverHome is a member/beneficiary and/or agent within the MERS system and at all relevant times was the loan servicer for plaintiff's loan, collecting payments, imposing fees, and commencing foreclosure proceedings; one in February of 2006, again in April, 2007 and the current proceeding in January 2008.

## RELEVANT FACTS

### The Mortgage Note Is a Contract of Adhesion

7.    The mortgage note executed by plaintiff is a standard Fannie Mae/Freddie MAC FORM contract. The mortgage note evidences the debt owed by the borrower to

the holder of the note, and is the basic contractual instrument in financing a home.

8.    The mortgage note is a contract of adhesion, in that it is prepared by a MERS member, and plaintiff was not given any opportunity to negotiate any of its terms or conditions. The mortgage note was offered on a "take it or leave it" basis.

<u>MERS  As the Assignee Under the Mortgage Note</u>

9.    When a borrower executes a mortgage note, MERS automatically becomes an assignee of the MERS member ( i.e., the principal lender). The mortgage loan is registered on the MERS System and title is held in the name of MERS. The beneficiaries of MERS, including lenders, mortgage originators, mortgage servicers, document custodians, settlement agents, title companies, insurers and investors, all gain their authority to take actions in connection with the administration of a mortgage, including foreclosure proceedings through MERS. Although MERS is not titled the lender in the mortgage transaction, it is named as beneficiary, assignee, or "nominee" and the practical effect is the same; MERS is the maker and holder of the mortgage note and is the secondary market in which all transactions take place, including foreclosures.

10.    The mortgage note, along with a deed of trust allegedly makes MERS the lender or the assignee of the mortgage loan and a beneficiary of the mortgage.

11.    The mortgage note executed by plaintiff (EXHIBIT A) is transferable, providing in relevant part that:

> I understand that the lender may transfer this Note. The lender or any one who is entitled to receive payment under this note is called the " note holder."

12.    In addition to the transferable mortgage note, plaintiff executed a security deed on July 23, 2004 attached hereto as EXHIBIT B, which references the mortgage note signed by plaintiff and specifically provides that "MERS" is the beneficiary or "nominee" under this security instrument." The security deed is also a standard form contract issued on a "Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT."

13.    The mortgage note and security deed allegedly gives MERS the authority to pursue foreclosures in the name of MERS if the borrower defaults on the mortgage note, as MERS is the alleged record holder and the holder of the mortgage note.

14.    In its directives to its members and agents regarding foreclosure procedures, MERS reveals that it

*"stands in the same position to foreclose as the servicer, [and] like the servicer, will be the record mortgage holder. It is the mortgage that gives MERS the authority to foreclose"* ( emphasis added).

15.    If a borrower defaults on a mortgage, the lender ( whether servicing the loan itself or using a servicer, sub-servicer or outside servicing agency) gains its authority to foreclose on a home from MERS. The manner in which MERS operates is set forth in the MERS Recommended Foreclosure Procedures guide attached hereto as EXHIBIT C and the MERS Quality Assurance Procedures Manual ( the " QAP ") attached hereto as EXHIBIT D.

16.    The MERS foreclosure guide directs that when executing the mortgage loan documents,

> The employees of the servicer [lender] will be certifying officers of MERS. An employee of a Lender, through his or her status as a certified officer of MERS, is authorized to sign any necessary documents in connection with the foreclosure. A corporate resolution of MERS grants the certifying officer this power. In other words, the same individual that signs the documents for the servicer will continue to sign the documents, but now as an officer of MERS.

The foreclosure Guide further explains that [by] virtue of having the servicer's employees be the certifying officers of MERS, MERS therefore can be an in-

house transfer of possession of the note so that MERS is considered the note holder for purposes of foreclosing the loan. *See* EX.D.

17.    Additionally the QAP Manual further sets forth the manner in which MERS operates. The QAP Manual contains a standard form Mortgage and Security Agreement, which provides for the assignment of title to MERS, and endows MERS with certain rights and powers under the loan.

18.    The Mortgage Agreement recites that:

> Borrower does hereby irrevocably mortgage, grant, bargain, sell, pledge, assign, warrant, transfer and convey to [MERS], and grant a security interest to Mortgagee in, the following property, rights, interests and estates now owned, or hereafter acquired by Borrower (collectively, the "Property").

Ex.D, Mortgage Agreement,Section 1.1

19.    MERS, then is the assignee under the Mortgage Note executed by plaintiff and as such, is liable to plaintiff for any violations of the terms of the Mortgage Note.

20.    By setting forth rules and procedures for mortgage lenders, mortgage servicers, and other beneficiaries, MERS is acting through its agents in every stage in the administration of mortgages, including the prosecution of foreclosures.

**Under The Terms Of The Mortgage Note, The Borrower's Liability Is Strictly Limited to Reimbursement Of Actual Attorneys' Fees And Other Costs, Fees and <u>Expenses Actually Incurred By MERS or Its Servicer</u>**

21.    The mortgage note sets forth the following provisions regarding payment of attorney's fees in the event plaintiff defaults on the note:

> . . . <u>the Note Holder</u> will have the right To be <u>paid back</u> by me for all of <u>its costs and expenses</u> in enforcing this Note to the extent not prohibited by applicable law. *<u>Those expenses include, for example, reasonable attorneys' fees.</u>*

22.    The words "paid back" and "its" are clear and unambiguous. The costs and expenses, including attorneys' fees, for which the borrower can be held accountable, are thus specifically and necessarily limited by the terms of the mortgage note to the fees and expenses <u>actually incurred</u> or obligated to be paid.

23.    Plaintiff is informed and believes that MERS has arrangements with attorneys for "flat-fee" per case rates. These rates are typically $400 to $500 per case. Pursuant to the mortgage note therefore, a borrower subject to an enforcement action should be obligated to reimburse MERS for no more than $400 to $500 ( depending on the fee arrangement).

24.    Rather than bill the borrower for its flat fee obligation, MERS directs, permits, or provides tacit approval to its attorneys and/or loan servicers to collect its fee directly from the borrower pursuant to the terms of the mortgage note. When payment is demanded however, it is an amount substantially in excess of MERS's flat fee (i.e., three to four times that rate or more) And, if these fees are not paid directly by the borrower, they are added to the settlement amount on a foreclosure sale of the property.

25.    In many cases, attorneys are permitted or directed to seek payment directly from the borrower pursuant to the terms of the mortgage note. Beyond acting as an agent of MERS, however, the attorneys have no contractual relationship with the borrowers and therefore no independent right to seek such payment. MERS nevertheless directs, permits or provides tacit approval to its attorneys to collect the higher fee thereby taking advantage of the unsophisticated and already debt-ladened borrower.

26.    Additionally, there are a variety of fees, charges and expenses associated with foreclosure that are demanded of a borrower that is the subject of an enforcement action. These fees include, but are not

limited to, appraisal fees, delinquency fees, recording fees, unspecified foreclosure fees and costs, administrative fees, escrow fees, late charges and interest charges. Plaintiff further alleges that these fees ( in plaintiff's case and perhaps numerous others,) were often inflated, unverifiable and outright false and fraudulently imposed.

> **Under The Doctrine of *Contra Proferentum*, The Mortgage Note Must Be Read to Limit Fees and Expenses to the Actual Amounts Incurred Or Due**

27.    The language in the mortgage note providing that the note holder and/or MERS is entitled to be "paid back" ... for all its costs and expenses associated with the enforcement of the note including reasonable attorneys' fees is naturally read to mean the borrower will be responsible for attorneys' fees actually incurred or was obligated to pay for enforcing the mortgage Note.

28.    With regard to attorneys' fees, since under no scenario will MERS or its loan servicer ever incur or be obligated to pay more than the flat fee, pursuing the borrower for sums in excess of that amount is a self evident breach of agreed upon terms.

29.    Likewise, if MERS or the loan servicer seek to collect costs, fees and expenses based upon cost

estimates, services not provided, costs and/or fees not incurred, or any amounts other than those actually paid or obligated to be paid by them, the clear terms of the mortgage note have been breached.

30.    To the extent the language is subject to any ambiguity, it is a well settled principle of contract law ( i.e., *contra proferentum*) that any ambiguous term in the contract should be construed against the drafter and in accordance with the reasonable expectations of the borrower when he entered into the contract. This doctrine particularly is applicable in this case where a sophisticated lending institution, which frequently engages in lending transactions, enters into a standardized contract of adhesion with a less sophisticated borrower.

31.    Nowhere in the mortgage note does it state that in addition to the attorneys' fees and expenses actually paid or due by MERS and/or the loan servicers to its foreclosure attorneys, MERS or its attorneys may also charge the borrower additional fees and expenses in excess of its actual obligations. It necessarily follows, then that a reasonable borrower, at the time of contracting, would have interpreted the language to mean that only actual attorneys fees and expenses incurred by MERS or its

loan servicer would be owed in the event of foreclosure proceedings.

32.    Accordingly, the only option available to MERS under the mortgage note is to charge plaintiff the flat fee and expenses actually paid or owed ( if not yet paid).

### Borrowers Are Demanded To Pay Attorneys' Fees Well In Excess of Amounts Paid or Due

33.    When a borrower fails to pay on terms of the mortgage note, MERS institutes foreclosure proceedings against the borrower. MERS conducts the foreclosure either directly or through the borrower's loan servicer ( whoever that happens to be currently by virtue of secondary assignments through the MERS System), by retaining a law firm to assist with the proceedings.

34.    Plaintiff is informed and therefore alleges that MERS customarily enters into flat-fee arrangements with attorneys throughout the country to prosecute foreclosure actions against the borrowers who fall behind on the payments due under their mortgage notes. MERS utilizes the services of such attorneys to file foreclosure actions in its own name.

35.    Plaintiff further alleges that, at the end of the foreclosure process, either the law firm retained by

MERS or the loan servicer sends a demand for payment to the borrower for fees and expenses—ostensibly under the authority of the mortgage note—with attorneys fees ranging from $1200 to $3000 and upwards. *In plaintiff's case, attorneys' fees denoted as "foreclosure fees" and demanded of plaintiff now approximate $30,000 ( thirty thousand dollars).* This is not a typographical error!

36.    There is no contractual relationship between the attorneys retained by MERS and the borrowers subject to an enforcement action. The law firm has no independent authority, other than through its relationship with MERS, to collect any legal fees in connection with foreclosure proceedings on the note. Therefore, in cases where payment is sought directly by the attorneys representing MERS, the attorneys are acting as agents of MERS collecting MERS's debt. This agency relationship is sufficient to make MERS directly responsible for the actions in collecting fees in excess of those incurred.

37.    An article featured in *The New York Times* on November 6, 2007, entitled, " Borrowers Face Dubious Charges in Foreclosures," highlights some of the unverifiable and downright fraudulent charges which in fact were passed on to plaintiff. A copy of the article is attached hereto as EXHIBIT E. Like excessive attorneys'

fees, any other costs, fees and expenses demanded of a borrower that are not actual verifiable costs, fees and expenses that were incurred by the lender, constitute a breach of the plain language of the mortgage note.

## FIRST CAUSE OF ACTION
### Breach Of Contract.

39.      Plaintiff incorporates all previous allegations and alleges that the defendants by and through its loan servicer EverHome Mortgage Company and its attorneys, breached the terms of the mortgage note by (1) charging plaintiff unwarranted late fees and that the late fee charges are false and unverifiable and in excess of contractual monthly amounts and limitations; (2) that defendants, by and through EverHome again acting as agent for defendants, are in breach of the mortgage note by attempting to charge plaintiff attorneys' fees of approximately $30,000 and that not only is such conduct a breach of the agreement but defendants are not incurring such fees as a part of the foreclosure action nor are such fees verifiable; (3) in the alternative plaintiff alleges that the attorneys' fees the defendants attempt to collect are based upon a term in the plaintiff's mortgage note that, according to defendants, permits the defendants to demand payment immediately for legal fees associated with

21

their defense of a lawsuit plaintiff filed in Federal Court in December of 2006 for ( among other things) violations of his Civil Rights and predatory lending practices in connection with a previous foreclosure attempt in that year, which lawsuit is still pending and which may go against EverHome as the named defendant. Defendants contend that even if plaintiff wins his lawsuit they are entitled to force plaintiff to pay for their legal expenses in defending against such action. To the extent defendants rely on any such term in the mortgage note for such authority, such term is invalid and unenforceable as unconscionable and unbelievably and grossly one-sided and against public policy. Also, such term amounts to a violation of plaintiff's constitutional rights under Georgia Law respecting free and unfettered access to the courts to address grievances. Plaintiff alleges that he should not be required to choose between protecting his Civil Rights and other rights of action or thereby lose his home to legal fees of defendants simply by the act of filing such actions; (4) defendants breached the note by charging excessive and unverifiable recording fees, escrow fees, administrative fees and a number of other undefined charges that are collectively denoted as " corporate advances".

40.    Upon entering the contract with MERS, plaintiff did not agree to pay any attorneys' fees and expenses in excess of those actually incurred or obligated to be paid under the flat-fee agreement in connection with a potential foreclosure proceeding. There was no meeting of the minds of the parties at the time the contract was formed as to the payment of attorneys' fees in excess of the flat-fee amount in the event of plaintiff's default and there was certainly no meeting of the minds regarding any duty or obligation on plaintiff's part that he would be required by the note terms to pay defendants legal fees incurred in plaintiff's attempt to enforce and protect his rights under the note or under the constitution of United States or the State of Georgia.

41. As a direct result of defendants' breach plaintiff has been damaged.

### SECOND CAUSE OF ACTION
### Unjust Enrichment

42.    Plaintiff incorporates by reference all previous allegations and further alleges that as a result of defendants breach of contract described above, defendants will be and have been unjustly enriched at plaintiff's expense resulting in unjustified earnings and/or profits to MERS and its agents and/or members.

23

43.    Defendants wrongfully overcharged plaintiff and directed and/or permitted their agents, including its loan servicer EverHome Mortgage Company, and its attorneys who are beneficiaries of MERS, to retain the fees and expenses that were in excess of those agreed upon as well as the interest or other profits earned on the proceeds, which were unlawfully received from plaintiff.

### THIRD CAUSE OF ACTION

### Breach of Duty of Good Faith & Fair Dealing

44.    Plaintiff incorporates all previous allegations and further alleges that defendants have a duty of good faith and fair dealing that is implied in the contract(s) with plaintiff, including the duty to charge plaintiff no more than actual costs, expenses and fees including attorneys' fees permitted under the terms of the mortgage note.

### FOURTH CAUSE OF ACTION
### Fraud

45.    Plaintiff incorporates all previous allegations and further alleges that defendants, by and through its agent/servicer EverHome Mortgage Company, commenced foreclosure proceedings against plaintiff on two separate occasions based upon a demand for payment of legal fees which, the first time, exceeded the sum of $20,000 and

other excessive fees and costs. Defendants commenced a second foreclosure action (the latest action) which demands attorneys fees of approximately $30,000 and other excessive fees and costs. Defendants' inclusion of grossly excessive, false and fraudulent fees and expenses were a deliberate attempt to induce foreclosure and prevent plaintiff from reinstating his mortgage so that defendants could acquire the equity plaintiff had accumulated in his home which is approximately $40,000 and/or to create an opportunity to generate additional profit by imposing associated foreclosure fees and expenses in a manner not permitted or contemplated by the terms of the mortgage note and Security Deed between plaintiff and defendants. Defendants knew, or had an obligation to know that such fees were excessive and outright false and violated the plain terms of the mortgage note. The defendants' conduct constitute fraud. The results of the study referred to in the article attached hereto as EXHIBIT E, and which were delivered to the National Conference of Bankruptcy Judges and the United States Department of Justice, points out:

> " Now that big lenders are originating fewer mortgages, servicing revenues make up a greater percentage of earnings. Because servicers typically keep the late fees and certain other charges assessed on delinquent or defaulted loans " a borrower's default can present a servicer with an opportunity for additional profit. . . Late Fees accounted for

11.5% of servicing revenues in 2006 at Ocwen
Financial, a big servicing company. At Countrywide,
$285 million came from late fees. . .".

The Office of the United States Trustee, a division of
the Department of Justice, has announced plans to move
against rogue mortgage servicing companies.

46.   As a result of defendants' conduct plaintiff
has suffered embarrassment and humiliation in the publicly
advertised foreclosures and pain and suffering. Plaintiff
is entitled to an award of punitive damages based upon
defendants' fraudulent acts and practices in an amount
sufficient to punish defendants who collectively reap
profits in the billions of dollars as a result of such
conduct throughout the country.

### FIFTH CAUSE OF ACTION
#### Negligent Commencement Of Foreclosures

47.   Plaintiff incorporates all previous
allegations and further alleges that defendants' conduct
constitute negligent commencement of foreclosure
proceedings in that the defendant owed a duty to plaintiff
of ordinary care to conduct its business in a professional
like manner and to not cause plaintiff any undue and
unnecessary damage to his reputation or to cause
unnecessary embarrassment and humiliation which plaintiff

suffered in the public nature of the foreclosures. Such damage was a foreseeable consequence of such acts.

## SIXTH CAUSE OF ACTION
### Georgia Fair Business Practices Act

48.    Plaintiff incorporates all previous allegations and further alleges that defendants' conduct constitute a violation of the Georgia Fair Business Practices Act, O.C.G.A.§ 10-1-390 entitling plaintiff to treble damages.

## SEVENTH CAUSE OF ACTION
### Georgia Fair Housing Act

49. Plaintiff incorporates all previous allegations and further alleges that MERS, through its members and controlling shareholders and agents, intentionally target African-Americans as their victims for overcharges and fraudulent fees, believing them to be more vulnerable resulting from under-education in the business of mortgage lending and lacking in sufficient resources to protect their rights against the wrongful conduct as alleged herein.

50.    Plaintiff alleges further, and in the alternative, that defendants' discriminatory practices have a disparate impact on the basis of race; all of which constitutes a violation of the Georgia Fair Housing Act, O.C.G.A. § 8-3-204.

27

**WHEREFORE** plaintiff demands judgment as follows:

1.    That he recover all financial losses as proved at trial;

2.    That he recover money damages for his embarrassment, humiliation and pain and suffering pursuant to O.C.G.A. 51-12-6;

3.    That all money damages be trebled pursuant to the Georgia Fair Business Practices Act;

4.    That he recover punitive damages in an amount of 10% of defendants' net worth sufficient to punish defendants in proportion to its wealth;

5.    That the Court strike all unconscionable, unreasonable, unconstitutional and otherwise unenforceable and invalid terms from the note and security deed and revising such terms as necessary;

6.    That he recover attorneys' fees and costs and any other relief as to the Court seems just and proper;

7.    That he have a trial by jury on all issues so triable;

This ____day of January, 2008.


By:_____
    Ellery Steed ( Pro Se )
    1517 North Ave. N.W.
    Atlanta, GA 30318
    404-454-7823

## VERIFICATION

I, Ellery Steed, being first duly affirmed, do hereby depose say and attest:

That I am the plaintiff in the foregoing action and I have read the contents contained therein and the same are true, and as to those matters stated upon information, I believe them to be true.


This 3() day of January, 2008.


BY: _____
Ellery Steed

Affirmed and subscribed before me this 30 day of January, 2008.

By: _____          S E A L
NOTARY PUBLIC
   RYAN MARIETTA
My Commission expires: 8-21-10 _____

29